# Exhibit F

Declaration of Chad S. Hummel dated September 16, 2013

*AT&T Intellectual Prop. et al. v. AIOTV, Inc.*
1:13-cv-1901-JOF

CONFIDENTIAL –
CERTAIN PORTIONS FILED UNDER SEAL

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF GEORGIA

2

Civil Action No. 13-cv-1901

3    _____

4      HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

                DEPOSITION OF: MICHAEL EARLE

5                     August 22, 2013

     _____

6

AT&T INTELLECTUAL PROPERTY II, L.P., and AIO WIRELESS

7    LLC,

8    Plaintiffs,

9    v.

10   AIOTV, INC.,

11   Defendant.

     _____

12

13

14           PURSUANT TO COURT ORDER, the deposition of

15   MICHAEL EARLE was taken on behalf of the Plaintiffs at

16   1999 Broadway, Suite 3150, Denver, Colorado 80202, on

17   August 22, 2013, at 8:59 a.m., before Amy L. Bland,

18   Registered Professional Reporter, Certified Shorthand

19   Reporter, and Notary Public within Colorado.

20

21

22

23

24

25

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 24

1    multiple sources of video content into a user

2    experience that feels unified.

3         Q.   There's no geographic limitation on source

4    of video aggregated, correct?

5         A.   Let me answer that two ways.  Yes, there

6    is limitations as provided by the content owners.

7    Certain assets are not made available in certain

8    geographic areas.  Our platform, as it ingests the

9    content, is not restricting that.  It is the content

10   owner that's restricting that.

11        Q.   Your platform has no geographic

12   restrictions?

13        A.   Correct.

14        Q.   Or -- or content ownership restrictions.

15   That is imposed by the content owner?

16        A.   Right.  Our platform is aware of those

17   restrictions and only places content in front of a

18   consumer that they can access wherever they may be at

19   the time.

20        Q.   Can you -- this is going to be a very

21   broad question, but I'd like to know.  What's your --

22   what's your initiating vision for the company?  What is

23   it that you want to do ultimately as a consumer-facing

24   product?

25             MR. WARTELL:  Object to form.

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 25

1              A.    Aggregate all sources of available --

2    freely available content from the web into a TV-like

3    experience for the consumers to interact with in a

4    lean-back approach, things that feel more like

5    television, that make video from the web more

6    consumable, and allowing consumers to aggregate

7    third-party subscriptions that they may have from

8    sources like Netflix and Hulu and Amazon all into one

9    platform.

10             Q.    (BY MR. HUMMEL)   VOD is video on demand?

11             A.    Correct.

12             Q.    TV Everywhere VOD is what?

13             A.    TV Everywhere is a common industry term

14   that basically defines how a consumer accesses certain

15   video-on-demand assets that have been made available by

16   the content owner for those who subscribe to their

17   linear live channel.

18             So, for clarity, if you subscribe to ABC

19   as a regular linear subscriber on cable or satellite,

20   you are entitled, if you're authenticated, to a certain

21   pool of video-on-demand assets made only available to

22   those that are paying for the live channel.

23             Q.    Sometimes on some platforms?

24             A.    Sometimes on some platforms, correct.

25             Q.    In fact, there's a current dispute going

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 26

1  on right now about that exact issue?

2         A.    Absolutely.

3         Q.    All right.

4         A.    Those are the things that our platform was

5  designed to manage for an operator.

6         Q.    And is your -- is your platform designed

7  to work similarly to an Apple TV, which is also a video

8  aggregator that does have -- I'm just trying to

9  understand the product, and I've looked at it.  But is

10  it -- Apple TV does aggregate those types of VOD

11  services as well as subscription services?

12         A.    Yes.  It -- it would be on its face

13  somewhat similar on the client side.  Where our

14  platform is highly differentiated is on the management,

15  on the back office of rights --

16         Q.    That's what I --

17               (Mr. Hummel and the deponent speaking at

18  the same time.  The court reporter asked for

19  clarification.)

20         A.    -- rights and curation.

21         Q.    What does "curation" mean?

22         A.    "Curation" is taking a pool of disparate

23  video assets, organizing them in a logical manner, and

24  presenting them to the customer.

25         Q.    That's your differentiating feature?

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 27

```
 1            A.    One of them, yes.

 2            Q.    A differentiating feature?

 3            A.    Mm-hmm.

 4            Q.    What's your educational background?

 5            A.    I have studied chemistry and computer

 6    science at Dalhousie University in Canada and an MBA

 7    from Pace.

 8            Q.    Have you ever traveled to Georgia, the

 9    state of Georgia, in connection with your work on -- or

10    with aioTV?

11            A.    Yes.

12            Q.    When?

13            A.    Two years ago for a technical trade show

14    where we attended as attendees, not exhibitors.

15            Q.    What was the show?

16            A.    The SCTE.

17            Q.    Where was it?  Atlanta?

18            A.    The Marriott downtown.

19            Q.    In Atlanta?

20            A.    Yes.

21            Q.    Did you attend by yourself?

22            A.    Yes, I did.

23            Q.    What was your purpose in attending?

24            A.    Get to know the state of the state as

25    cable operators viewed the over-the-top market.  So I
```

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 28

1   attended as far as to understand the way the cable

2   operators viewed this burgeoning space.

3           Q.    So at SCTE, Cox would have been there?

4           A.    Cox would have been there, and they

5   presented there.

6           Q.    They presented.  Okay.  Did AT&T Mobility

7   present there?

8           A.    I can't recall.

9           Q.    It would be the HTML5 Internet-enabled

10  devices that -- that would access the cloud-based

11  service that you offer for consumers, correct?

12          A.    Correct.  And for clarity, the Android

13  client does the same thing, just in a different way.

14          Q.    But with respect to that -- that HTML5

15  platform, that would run using iPad, PC, Mac, those

16  devices -- right? -- as well as Android?

17          A.    Mm-hmm.

18          Q.    Is that yes?

19          A.    Yes.

20          Q.    Okay.  When you've written that the aioTV

21  service provides an index of video metadata that points

22  the content in any location, what does that mean?

23          A.    What that means is that when a consumer is

24  presented with a video on the screen and chooses to

25  watch it, it is streamed directly from its original

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 31

1          Q.    I'm just going to read this into the

2     record.  Is your subscription home page to consumer

3     http://aio.tv/portal/home.php?

4          A.    Correct.

5          Q.    Can a Georgia resident establish a user

6     account from the state of Georgia using that portal?

7          A.    Yes.

8          Q.    Are there Georgia users?

9          A.    Yes.

10         Q.    Can you do -- can you accomplish this from

11    a desktop computer in Georgia?

12         A.    Yes.

13         Q.    Are there any restrictions on the ability

14    of a Georgia user to sign up?

15         A.    No.

16         Q.    Are there any limits on content available

17    to Georgia users specifically?

18         A.    No.

19         Q.    Is all content available either from the

20    client download method of accessing aioTV or the cloud

21    method that we discussed equally available to Georgia

22    residents?

23         A.    Yes.

24         Q.    Is it true that aioTV can be accessed via

25    the cloud method using Apple products?

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 32

1          A.    Yes.

2          Q.    Does aioTV -- strike that.

3                Does aioTV offer an app?

4          A.    Can you define that a little further?

5          Q.    Could you go to the iTunes store and

6     download an aioTV application?

7          A.    No.

8          Q.    What is Google Play?

9          A.    Google Play is similar to the Apple App

10    Store specifically related to Android applications.

11         Q.    Can you download the aioTV platform from

12    the Google Play?

13         A.    You can download the aioTV client from

14    Google Play.

15         Q.    How do you do that?  Can you describe the

16    process?

17         A.    The consumer would access Google Play

18    either through search or browsing, happen upon the Aio

19    application, and they would have the option to click

20    "install" from that site, and it would install it on

21    their device.

22         Q.    Can a client perform that function from

23    the state of Georgia?

24         A.    Yes.

25         Q.    And have customers done that?

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 37

1    presented with an instruction that says, Here is how

2    you add it to your home screen.  You follow that

3    instruction.

4                And from that point forward, you will have

5    an icon on the Apple device that looks like any other

6    application on the iPad that, from that point forward,

7    when you access it, would open it in full screen,

8    feeling like an app.

9         Q.    Would that be the same process for an

10   iPhone?

11        A.    Yes.

12        Q.    Same process for a non-Android device?

13        A.    No.

14        Q.    Because you wouldn't access it through

15   Safari?

16        A.    Right.  Well, it could be through any web

17   browser.  Your instructions on how to use it would be

18   specific to the device.

19        Q.    Understood.  And there would be no

20   limitations on the -- on -- on the processes you just

21   described or the process you just described if the

22   resident was accessing aioTV using an Apple device if

23   that resident were located in Georgia?

24        A.    Correct.

25        Q.    Does aioTV actively promote itself as

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 38

1   being available, ongoing TV?

2          A.    Yes.

3          Q.    How?

4          A.    Through our social media sites, Twitter

5   and Facebook, and on our website.

6          Q.    And there's no geographic limitation on

7   where that marketing takes place?

8          A.    That's correct.

9          Q.    So a Georgia resident could look at

10  Facebook or Twitter and see that promotion?

11         A.    Absolutely.

12         Q.    Are there any user restrictions at all to

13  consumers who want to access aioTV in Georgia?

14         A.    No.

15         Q.    Okay.

16                MR. HUMMEL:  Just mark this as Exhibit 1.

17                (Deposition Exhibit 1 was marked.)

18                MR. HUMMEL:  You've seen it?

19                THE DEPONENT:  Thank you.

20                MR. LYONS:  Okay.

21                MR. HUMMEL:  I've marked as Exhibit 1 for

22  purposes of this deposition a document entitled

23  "Verified Complaint and Jury Demand," which was filed

24  by aioTV, Inc., in the United States District Court for

25  the District of Colorado on or about July 3, 2013.

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 47

1    guest in Georgia, would that -- to your knowledge,

2    would that person ping to aioTV as a California

3    resident or Georgia?

4           A.    Could be either.  It depends on what

5    provider they're using and where the IP address is

6    registered.

7           Q.    You couldn't necessarily tell?

8           A.    I could not necessarily tell.

9           Q.    Okay.  Continuing on in paragraph 14, the

10   subparagraph (b) describes the industry customers who

11   have paid aioTV license fees for allowing them to offer

12   the aioTV platform to their wireless phone and Internet

13   customers, correct?

14          A.    Mm-hmm.

15          Q.    That's the second category?

16          A.    That's the second category.

17          Q.    Okay.  And that so far has been the

18   predominant source of your revenues?

19          A.    Correct.

20                MR. WARTELL:  Object to form.

21          Q.    (BY MR. HUMMEL)  And by "predominant,"

22   more than 90 percent?

23          A.    At this moment, yes.

24          Q.    On paragraph 15, you identify 150,000

25   users as of the date of this complaint who fall into

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 50

1    better served from Google.

2         Q.   (BY MR. HUMMEL)  Okay.  Paragraph 19, you

3    talk about Aio brand as a strong, inherently

4    distinctive brand in the wireless marketplace.  Do you

5    see that?

6         A.   I do.

7         Q.   Does that wireless marketplace include the

8    state of Georgia?

9         A.   Yes.

10        Q.   Paragraph 26.  Paragraph 26 describes an

11   event that occurred on May 9, 2013, where Aio Wireless

12   went live with a new website for its Aio Wireless

13   service.  Do you see that?

14        A.   I do see that.

15        Q.   Do you consider that transacting business

16   in Colorado?

17             MR. WARTELL:  Objection.  All of -- object

18   on the same grounds, which is it exceeds the scope of

19   the deposition.  In lieu of instructing the witness not

20   to answer, I'll allow the witness to answer and

21   preserve the objection for later.

22             Go ahead.

23        A.   Could you repeat the question, please?

24             MR. HUMMEL:  Would you mind reading that

25   one back?

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 60

1          Q.   Is it true that aioTV has no knowledge of

2    or control over where or in what states your

3    independent licensees market and sell your products and

4    services?

5          A.   The question again?

6               MR. HUMMEL:  Could you read that one back?

7               (The last question was read back as

8    follows:  "Is it true that aioTV has no knowledge of or

9    control over where or in what states your independent

10   licensees market and sell your products and services?")

11         A.   That is not a true statement.

12         Q.   (BY MR. HUMMEL)  Okay.  In what sense is

13   it not true?

14         A.   We do have some knowledge of where our

15   licensees offer service.  We have no control over where

16   they offer their service.

17         Q.   You could negotiate that, but you haven't?

18         A.   Correct.

19         Q.   Okay.  So let me just mark your

20   Declaration in connection with the Motion to Dismiss

21   filed in Georgia as Exhibit 3.

22               (Deposition Exhibit 3 was marked.)

23         Q.   Is Exhibit 3 a copy of your Declaration,

24   which you signed under penalty of perjury on July 1,

25   2013?

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 61

1            A.    Yes, it is.

2            Q.    Okay.  I was reading to you -- and I

3     didn't mean to be unfair about it -- paragraph 15 on

4     page 3.

5            So that's a true statement except that

6     there's a qualification that you have some knowledge of

7     where those independent companies market and sell your

8     products and services?

9            A.    That is true.

10            Q.    Okay.  And, to your knowledge, some of

11     your third-party licensees, if not -- if not all U.S.

12     licensees, market and sell your products and services

13     in the state of Georgia?

14            MR. WARTELL:  Objection.  Foundation and

15     form.

16            Go ahead.

17            A.    Some.

18            Q.    (BY MR. HUMMEL)  Some do?

19            A.    Some do.

20            Q.    Do you know which?

21            A.    ███████████

22            Q.    Do you know if Google does?

23            A.    Google, clearly, yes.

24            Q.    What about ███████████████████?

25            A.    No.

Page 62

1          Q.    Where do they offer their services?

2          A.    ████████████ offers their services -- it's

3    simply a trial at this point.  There's no outside

4    offering.

5          Q.    What is the relationship with ████?

6          A.    They are a licensee of the platform.

7          Q.    Where do they operate?

8          A.    They operate out of California.  Or I'm

9    sorry.  ████████████████████.

10          Q.    Aren't they out of Olympia, Washington?

11          A.    Sorry.  Again, too many customers.

12          Q.    I understand.

13          A.    ████ is also known as ████████████.  Same

14    thing.  They offer their services, to my knowledge,

15    only in certain markets in Washington state.

16          Q.    ████████ you said, offers their services

17    in Florida?  Excuse me.

18          A.    Out of Florida.

19          Q.    Out of Florida, but in Georgia?

20          A.    Nationwide.

21          Q.    Nationwide.  What about ████████████

22    ████████████?  That's a U.K. company?

23          A.    ████████████████████████████ company to

24    my knowledge.  I don't know where their registration

25    is, but our deal is with them in Utah.

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 63

1        Q.    What about ███████?

2        A.    Same company.

3        Q.    And it's not a U.K. company?

4        A.    Not to my knowledge.

5        Q.    Okay. ██████████████?

6        A.    Minnesota-based.

7        Q.    Winona, Minnesota?

8        A.    Yeah.

9        Q.    And ████████████████, I think we

10   talked about before.  They're a Michigan company?

11        A.    Michigan, correct.

12        Q.    And do they offer their services

13   nationwide?

14        A.    No.

15        Q.    What about███████?

16        A.    ███████ is a what we call infinity group

17   customer.  They offer their services nationwide to

18   religious groups, churches, what have you.  They have

19   not launched their service.

20        Q.    ███████?  It's a Mexican company?

21        A.    It's in Mexico.

22        Q.    Okay.  And ████████, that's the

23   investment holding company?

24        A.    Yes.  And also a licensee in Asia.

25        Q.    ██████████?

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 64

1           A.    Asian company.

2           Q.    Only services in Asia?

3           A.    Correct.

4           Q.    ██████████████?

5           A.    I believe they are a Swedish company

6    offering services to hoteliers in the MENA region.

7           Q.    What region?

8           A.    MENA, Middle East.

9           Q.    Not in the U.S.?

10          A.    No.

11          Q.    ████████████████████████████?

12          A.    Panama-based company cable provider.

13          Q.    No U.S. operations?

14          A.    No.

15          Q.    No U.S. access?

16          A.    No.

17          Q.    ████████████████?

18          A.    ███████████ is, I believe, Brazil.  I'd

19   have to -- it's either Brazil or Chile.

20          Q.    No U.S. access?

21          A.    Correct.

22          Q.    ███████████████?

23          A.    ███████ is a Canadian operator.

24          Q.    No U.S.?

25          A.    (Deponent shakes head from side to side.)

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 65

1          Q.    ███████████████████████?

2          A.    ██████ is in Latin America.  I can't

3     remember whether it's Chile or Brazil.

4          Q.    ████?

5          A.    █████ is in Columbia.

6          Q.    And do you have any present offering

7     through █████?

8          A.    In the market, no.

9          Q.    What about with █████ generally?

10         A.    No.

11         Q.    So, at this point, your U.S. -- the U.S.

12    consumers' access to aioTV through where your

13    white-label product is ████████████ [sic] and Google?

14         A.    Correct.

15         Q.    Any others?

16               THE DEPONENT:  So the question again?

17    Sorry.  Can you read that back?

18               (The testimony on page 65, lines 11

19    through 15 were read back as follows:

20               Question: So, at this point, your U.S. --

21    the U.S. consumers' access to aioTV through where your

22    white-label product is ███████████ [sic] and

23    Google?" --)

24               MR. HUMMEL:  ████████████

25               MR. WARTELL:  I think you did say

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 68

1        Q.    (BY MR. HUMMEL)  I'm just asking you, did

2    you personally do the work to attempt to identify the

3    direct service users who had a mailing, post office

4    box, or Internet protocol address in Georgia?

5        A.    I did not personally do the work.

6        Q.    Who did the work?

7        A.    One of our technicians in the Canada

8    office.

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11       A.    They would have run a query against our

12   database, looking for any zip codes or state

13   designation that would have referenced the state of

14   Georgia.

15       Q.    So if you can look back at your web

16   portal, Exhibit -- I think it was 2.

17       A.    Mm-hmm.

18       Q.    And the second page.

19       A.    Yes.

20       Q.    The only thing that's asked for there is

21   an e-mail address, password, and -- and what else?

22       A.    User name.

23       Q.    And the user name?

24       A.    Mm-hmm.

25       Q.    So at no point in the registration process

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 69

1    do you ask for a zip code?

2          A.    Currently.

3          Q.    So how would a zip code have been

4    registered in any database?

5          A.    Back in early 2010 and 2011, before we

6    changed the registration process, we had a more

7    involved registration form than we do now.

8

9

10

11         A.    Correct.

12         Q.    -- that currently exist?

13         A.    That's correct.

14

15

16

17

18

19

20

21

22

23         A.    Correct.

24         Q.    And also you have no way of ascertaining

25    how many guest log-ins occurred from the state of

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 70

1    Georgia?

2              A.     Correct.   We don't track that.

3              Q.     With Georgia residents?

4              A.     Right.

5              Q.     Okay.   And after those -- after a Georgia

6    resident, hypothetically, logs in and either downloads

7    the client or accesses it through the cloud, they are

8    exposed to the advertising that -- that generated some

9    revenues as, for example, listed on Exhibit 4?

10              MR. WARTELL:   Object to form.

11              You can answer.

12              A.     Correct.

13              Q.     (BY MR. HUMMEL)   Okay.   Look at

14   Interrogatory No. 2, which asks, "State the number of

15   aioTV Indirect Service Users that have or had a

16   mailing, post office box, or Internet Protocol address

17   located within the State of Georgia by year, from 2010

18   to the present."

19              In the second paragraph of the response,

20   on page 4 of 11 -- actually, it's the third full

21   paragraph of the response -- there's a sentence that

22   reads, "Defendant has sought responsive information

23   from its licensees and other -- other authorized users

24   of Defendant's services that might have customers in

25   Georgia."

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 71

1            Who engaged in the inquiry with your

2     licensees on that subject?

3            A.    Either myself or Jim Anderson.

4            Q.    Okay.  So did you call Google or contact

5     Google?

6            A.    I e-mailed Google.

7            Q.    E-mailed Google?  Did you receive a

8     response?

9            A.    No.

10           Q.    Did you follow up with a phone call?

11           A.    No.

12           Q.    Do you have a contact at Google TV?

13           A.    Many contacts at Google TV.

14           Q.    Is there a principal contact?

15           A.    Yes.

16           Q.    And who's that?

17           A.    ███████████████████

18           Q.    Could you spell the last name?

19           A.    ████████████

20           Q.    That's who you e-mailed?

21           A.    Yes.

22           Q.    And you received no response?

23           A.    No.

24           Q.    Did you try to call her?

25           A.    No.

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 72

1    Q.    Did you send any follow-up letter?

2    A.    No.

3    Q.    Follow-up e-mail?

4    A.    No.

5    Q.    Where is Ms. ████ located?

6    A.    In Mountainview, California.

7    Q.    Bay Area?

8    A.    Yes.

9    Q.    Any other licensees, to your knowledge,

10   other than ████ or Google that you reached out to?

11   A.    No.

12   Q.    Because those were the principal

13   U.S.-based national services that could have indirect

14   users located in Georgia?

15   A.    That's correct.

16   Q.    And I -- the ████ response was that

17   they had 288 users in defendant services who signed up

18   for those services through ████ associated --

19   through ████ associated themselves with the zip code

20   within the state of Georgia?

21   A.    That's correct.

22   Q.    All right.  And can you -- I may have

23   asked this question.  Can you access the aioTV service

24   through ████ as a guest?

25   A.    That, I'm not certain of.

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 78

1          Q.    No TV advertising?

2          A.    No.

3          Q.    Any direct e-mail marketing to potential

4    licensees?

5          A.    Licensees being B-to-B?

6          Q.    Yes.

7          A.    Yes.

8          Q.    Is there a standard form e-mail that's

9    sent out to potential B-to-B licensees?

10          A.    No.

11          Q.    It's all targeted?

12          A.    Yes.

13          Q.    Yes?  To your knowledge, have you marketed

14    or -- in that way to Georgia-based companies?

15          A.    We have had e-mail exchanges with Cox

16    Communications.

17          Q.    When did those occur?

18          A.    Would have been mid 2000 -- sorry -- early

19    2012.

20          Q.    The purpose of those communications was

21    what?

22          A.    Attempting to sell the platform for their

23    use, white label.

24          Q.    Describe what you were trying to sell.

25          A.    The aioTV platform.

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 79

1          Q.    To Cox Communications as a cable provider?

2          A.    Yes.

3          Q.    Did you ever visit Cox?

4          A.    No.

5          Q.    Were those e-mail exchanges or just

6    one-way transmissions from you to Cox?

7          A.    No.   They were exchanges.

8                THE DEPONENT:   And I will need a "bio"

9    shortly.   My coffee has found the bottom.

10               MR. WARTELL:   Can we take a break?

11               MR. HUMMEL:   Sure.   It's a good time.

12               (Recess taken, 11:00 a.m. to 11:10 a.m.)

13          Q.    (BY MR. HUMMEL)   I'm just going to show

14   you something.   I'm confident you haven't seen it, but

15   I just want to ask anyway.   Exhibit 6.

16               (Deposition Exhibit 6 was marked.)

17          Q.    So ████████    is one of your principal

18   investors?

19          A.    Yes.

20          Q.    Did you know they were registered to do

21   business in the state of Georgia?

22          A.    I did not.

23          Q.    You don't recognize Exhibit 6, I take it.

24          A.    I've not seen this before.

25               MR. HUMMEL:   Okay.   I'm not going to

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 88

1  computer product; it's a smart TV product, essentially?

2      A.   I wouldn't characterize it that way.  It

3  is a -- on the set-top box basis, effectively, it is a

4  computer product built inside a stand-alone box

5  specifically designed to connect to the television.

6      Q.   Okay.  And the set-top boxes are

7  created -- are manufactured for Google TV specifically?

8      A.   No.  The manufacturer -- well, yes.

9  Manufacturers build them with the intent of offering

10  the Google TV platform as its premise.

11      Q.   Okay.  Are there smart TVs that offer the

12  Google TV?

13      A.   Yes, there are.

14      Q.   So a Samsung?

15      A.   Samsung, LG, Sony, possibly Vizios now as

16  well.

17      Q.   And you can access the Google TV product

18  by connecting to the Internet on your smart TV, and,

19  with the Google TV product, you can access the aioTV

20  white-label product through Google TV?

21      A.   Or the aioTV direct-to-consumer platform.

22      Q.   And do you know how many consumer-facing

23  devices have Google TV presently installed?

24      A.   We do not have a specific number.  There's

25  a lot of intrinsic data in the market that would

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY

Page 89

1   indicate that it's over 1 million.

2         Q.    Mm-hmm.  Including in Georgia?

3               MR. WARTELL:  Objection.  Foundation.

4         Q.    (BY MR. HUMMEL)  If you know?

5         A.    I would have no idea how many, but

6   certainly there -- there's likely to be some in

7   Georgia.

8               MR. HUMMEL:  Off the record.

9               (Recess taken, 11:25 a.m. to 11:36 a.m.)

10        Q.    (By MR. HUMMEL)  Did aioTV have any

11  contracts with any Georgia companies?

12        A.    No.

13        Q.    With any Georgia individuals?

14        A.    No.

15        Q.    Any oral agreements with any Georgia

16  companies?

17        A.    No.

18        Q.    Are you in any -- presently in any

19  contract discussions with any Georgia companies?

20        A.    No.

21        Q.    Other than Cox Communications, have you

22  had any interaction regarding potential licensing

23  arrangements with Georgia companies?

24        A.    No.

25        Q.    None other than Cox?